# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>JOSE EDWARDO BUCIO-SANCHEZ,<br><br>  Defendant. | No. CR06-4069-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

This matter is before the court on a motion to suppress evidence (Doc. No. 42) filed by the defendant Jose Eduardo Bucio-Sanchez ("Bucio" or "Jose") on November 15, 2006. On July 27, 2006, Bucio was charged with one count of conspiracy to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A), and possession of 50 grams or more of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). (*See* Doc. No. 3)

The plaintiff (the "Government") resisted Bucio's motion to suppress on November 27, 2006. (Doc. No. 49) Pursuant to the trial management order (Doc. No. 11), motions to suppress were assigned to the undersigned for review and the preparation of a report and recommended disposition. Accordingly, the court held a hearing on the motion on December 21, 2006, at which Assistant U.S. Attorney John Lammers appeared on behalf of the Government, and Bucio appeared in person with his attorney, Jason Finch. The Government offered the testimony of Task Force Officer Dane Wagner, Nebraska State Patrol Trooper Dail Fellin, and Sioux City Police Officer Salvador Sanchez. One exhibit was admitted into evidence, to-wit: Gov't Ex. 1, a DVD containing video of Trooper Fellin's June 22, 2006, traffic stop of Bucio.

The motion is now fully submitted, and the court turns to consideration of Bucio's motion to suppress evidence.

## BACKGROUND FACTS

On June 22, 2006, Task Force officers conducted a controlled buy of methamphetamine from Jorge Valdivia, Bucio's codefendant in this case. Valdivia arrived at the buy location carrying three ounces of crystal methamphetamine. Officers arrested Valdivia and took him to the Sioux City Police Department, where Valdivia gave a post-*Miranda* statement. He stated he had obtained the drugs from his supplier, who he described as an Hispanic male by the name of Jose or "El Primo." Valdivia agreed to cooperate with officers by making a call to his supplier to order more drugs. Valdivia stated he owed Jose some money, and he would tell Jose he could pay him to induce Jose to meet him.

In the officers' presence, Valdivia called a number from his cell phone.[1] A Spanish-speaking male answered the phone. Valdivia ordered more drugs using a prearranged code between the two. Valdivia said he had some "pork skins" or "pork rinds" for Jose, and he requested something like "three more buckets of lard," which Valdivia explained was their code for three more ounces of methamphetamine. The supplier agreed to meet Valdivia. Valdivia told the officers the supplier would be traveling from the Wakefield, Nebraska, area and arrive in South Sioux City, Nebraska, in about half an hour.[2] He further stated the man would be driving either a Chevrolet Blazer or a tan Mercury Villager minivan, and the vehicle would have "35 county plates," which designates the Nebraska county in which Wakefield is located.

---

[1]Officer Sanchez testified Valdivia's calls to his supplier were recorded.

[2]TFO Wagner recalled that Valdivia stated his supplier would be coming from the Wakefield area. Officer Sanchez recalled only that Valdivia told the officers how long it would take his supplier to arrive in South Sioux City, but did not state he would be coming from Wakefield. Given that TFO Wagner told Trooper Fellin to watch for a vehicle coming from the Wakefield area, the court credits TFO Wagner's recollection of Valdivia's statement.

At approximately 6:00 p.m., TFO Wagner contacted Trooper Fellin, who agreed to watch for the vehicle on Highway 20, the most direct route of travel from Wakefield to South Sioux City. About twenty-five minutes later, Trooper Fellin observed a Mercury Villager minivan matching the description given by Valdivia, heading toward South Sioux City on Highway 20, from the direction of Wakefield. Trooper Fellin testified it was still fully light outside at that time of day in June. He stated that as the van drove past, the driver, an Hispanic male, looked at him and then quickly looked away as if to avoid him, which further drew the officer's attention to the van. Trooper Fellin called TFO Wagner to report that he had believed he had seen the van in question, and he was going to follow the van.

After Trooper Fellin had followed the van for about a mile-and-a-half, he saw the van change lanes and make a left turn without signaling, which the officer testified is a violation of Nebraska law. He stopped the vehicle for the traffic violation. He approached and asked the driver for his driver's license. The driver, who identified himself as Jose, was unable to produce a valid Nebraska driver's license. Trooper Fellin asked Jose to come back and sit in his patrol car, and Jose complied, sitting in the front passenger seat. The officer testified his Spanish is "extremely limited," and Jose spoke in broken English. However, Jose seemed to understand the officer's directions and questions and responded appropriately to them.

Trooper Fellin explained to Jose that he had been stopped for turning without signaling. While Jose was in the patrol car, the trooper walked around Jose's vehicle and saw a cell phone in plain view on the passenger seat. The trooper reported this to TFO Wagner, who stated he would call the number Valdivia had used earlier to contact his supplier so the officers could determine if the number belonged to the cell phone in Jose's car. TFO Wagner stated he would call the number, let it ring three times, and then hang up.

Trooper Fellin took the phone from the vehicle, carried it back to the patrol car, and handed it to Jose. He asked Jose if the phone belonged to him, and Jose replied that it did. Officer Wagner called the number Valdivia had used to call his supplier, and the phone in Jose's hand rang three times and then stopped ringing. Trooper Fellin then issued Jose a warning for failing to signal his turn. He asked Jose for consent to search his vehicle and Jose agreed. The trooper searched the vehicle but did not find anything incriminating. In addition, the trooper is a K-9 handler, and he testified he took his dog around Jose's vehicle but the dog did not alert on the vehicle. The trooper released Jose, who took the phone with him and left the scene in the van. The traffic stop was recorded by Trooper Fellin's patrol car video camera. (*See* Gov't Ex. 1)

By the time Trooper Fellin completed the traffic stop with Jose, other Task Force officers were in the vicinity. They conducted surveillance on Jose for about an hour. During that time, Valdivia talked with Jose again at least once to confirm that the meeting still was going to take place. Jose wanted to meet Valdivia at a sports bar/restaurant in South Sioux City. When Jose was about two blocks from the restaurant, officers stopped him again, arrested him, and transported him to the Dakota County Jail. Officer Sanchez, who is fluent in Spanish, advised Jose of his rights, and then TFO Wagner and Officer Sanchez interviewed Jose briefly, with Officer Sanchez translating. Jose told the officers he lived in a trailer court outside of Wakefield, Nebraska, on the highway, but he provided no further information.

The officers drove to Wakefield and made contact with a local sheriff's deputy. The deputy could identify only one group of trailers that he thought met the description given by Jose. At 11:00 to 11:30 p.m., the deputy went to the location and observed that there were eight or nine trailers in a group on what appeared to be farm land. The deputy noticed that a Chevrolet Blazer was parked outside one of the trailers. When the deputy pulled up to the trailer, he observed two Hispanic males standing on a front deck area by

4

the trailer where the Blazer was parked. When the men saw the deputy, they appeared startled and hurriedly went inside the trailer. The deputy reported this information to the Task Force officers.

TFO Wagner and Officer Sanchez followed the deputy back to the trailer, and they knocked on the door, which was opened by a Javier Lopez-Montejano ("Lopez"). Lopez stated he lived at the trailer with a man named Jose. Both TFO Wagner and Officer Sanchez testified it appeared to them that Lopez lived at the trailer and could consent to a search. The officers asked if they could perform a protective sweep of the trailer to be sure no one else was present, and Lopez agreed.[3] No one else was present inside the trailer, but the officers observed a quantity of U.S. currency in plain view on a shelf in an open, recessed area of a back bedroom. The officers then asked Lopez for permission to search the trailer, and Lopez consented to the search. Officer Sanchez asked Lopez if there were any drugs in the trailer. Lopez said there were drugs in his room, and pointed to a bedroom. The officer asked Lopez to confirm which room was his, and Lopez pointed to the same bedroom. The officer asked where Jose slept, and Lopez pointed to the back bedroom. The door to Jose's room was open, and the light was on. Inside the room was a recessed area, not separated by a doorway, where the officers had seen the quantity of U.S. currency during the protective sweep. In other areas of the trailer, officers found drug paraphernalia and methamphetamine, as well as additional currency that was hidden in a vent above the stove.[4] Lopez was arrested on state charges of possession of drugs and paraphernalia. He later was released on bond, and apparently has absconded. The officers testified they believe he has left the country.

---

[3]The officers testified that although Lopez did not appear dangerous or threatening, the officers are always on guard during drug investigations and customarily will perform a protective sweep for officer safety.

[4]The court notes other officers arrived at the scene to assist in the search, with as many as four officers searching the trailer at one point.

In addition to the search of the trailer, the local sheriff's deputy had a K-9 unit with him. The dog alerted on the Blazer parked outside of the trailer, but a search of the vehicle did not reveal any incriminating evidence.

Officers later contacted the owner of the trailer and learned that Bucio was not listed on the trailer lease as an occupant. They further learned neither Bucio nor Lopez paid the rent on the trailer; it was paid by an unknown third party. The officers have not established the identity of the second Hispanic male who was seen earlier in the evening by the local deputy.

## *DISCUSSION*

### *A. Suppression of Telephone Call*

Bucio asks the court to suppress the evidence of the telephone call made to the cell phone during his traffic stop by Trooper Fellin. He argues Trooper Fellin stopped him "without reasonable suspicion or probable cause that a law had been violated," and the trooper's stop of his vehicle was a violation of Bucio's Fourth Amendment rights. (*See* Doc. No. 42-2, pp. 3-6) Bucio further argues the fact that the trooper did not discover illegal contraband on Bucio's person or in his vehicle "highlights the reality that the initial stop of [Bucio's] vehicle and the subsequent searches lacked supporting reasonable suspicion or probable cause to meet the reasonableness requirement of the Fourth Amendment." (*Id.*, pp. 4-5)

In making these arguments, Bucio has misconstrued Trooper Fellin's stop of Bucio's vehicle as an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Although Bucio is correct that "an investigative stop must be supported by reasonable, articulable suspicion that criminal activity may be afoot," *United States v. Miller*, 974 F.2d 953, 956 (8th Cir. 1992) (citing *Terry, supra*, 392 U.S. at 25-31, 88 S. Ct. at 1882-85), the same cannot be said of a stop when an officer observes

an actual traffic violation. Here, the trooper stopped Bucio for committing the traffic violation of failing to signal his left turn. The officer could have stopped Bucio for any traffic violation, however minor, even if the stop was pretextual. *See, e.g., United States. v. Perez*, 200 F.3d 576 (8th Cir. 2000) (following too close); *United States v. Beatty*, 170 F.3d 811 (8th Cir. 1999) (no working light illuminating license plate); *United States v. Lyton*, 161 F.3d 1168 (8th Cir. 1998) (following too close).

At the hearing, Bucio appeared to argue that because the trooper only issued Bucio a warning, rather than a citation, this confirmed that the officer actually did not observe Bucio committing a traffic violation. This argument is without merit. The officer testified he saw Bucio make a left turn without signaling, and the court credits his testimony. Whether or not he issued a citation is irrelevant to his lawful authority to make the stop.

The more problematic question is whether the officer lawfully opened the door of Bucio's car and retrieved the cell phone. However, even if Trooper Fellin's retrieval of the phone was unlawful, the evidence nevertheless is admissible under the doctrine of inevitable discovery. The doctrine of "inevitable discovery" allows for the admission of illegally seized evidence if the government meets certain conditions. "To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Connor*, 127 F.3d 663, 667 (8th Cir. 1997) (citation omitted); *accord United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (citations omitted).

In the present case, both prongs of this test are met. Evidence that the phone located in Bucio's vehicle was the same phone Valdivia had called in the officers' presence inevitably would have been discovered in the course of the ongoing investigation that

evening. TFO Wagner could have called the number used by Valdivia while the cell phone remained on the passenger seat of Bucio's van, and Trooper Fellin could have observed whether or not the phone rang from outside the van. Alternatively, the trooper would have discovered the phone during his consent search of the vehicle in any event, and the events then could have unfolded just as they did; i.e., the trooper could have handed the phone to Bucio, and then TFO Wagner could have made the call.[5] Physical evidence that inevitably would have been discovered does not need to be excluded. *See Nix v. Williams*, 467 U.S. 431, 446, 104 S. Ct. 2501, 2510, 81 L. Ed. 2d 377 (1984); *United States v. Vance*, 53 F.3d 220, 221 (8th Cir. 1995); *United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir. 1992).[6]

### B. *Suppression of Evidence from Search of Trailer*

Bucio further asks the court to suppress the evidence seized at the trailer in Wakefield, Nebraska. He argues the officers' search of the trailer "exceeded the limits of the allowable consent given to search the premises." (Doc. No. 42-2, p. 6) He claims Lopez lacked the authority to consent to a search of Bucio's bedroom. He further maintains that because the officers' search exceeded the scope of Lopez's consent authority, evidence from the *entire* search should be suppressed. Bucio also argues the

---

[5]Furthermore, although the court does not need to reach the issue, there very well may have been probable cause for a search of Bucio's vehicle in any event. Trooper Fellin had observed a vehicle of the same make and model, coming from the same direction, as described by Valdivia. The vehicle was being driven by an Hispanic male, and had reached the trooper's location within the time frame described by Valdivia.

[6]Bucio further argues the fact that the cell phone rang when TFO Wagner made the call is inconclusive to prove he was involved in a drug conspiracy. (*See* Doc. No. 42-2, p. 6) Bucio is free to make that argument to the jury at trial. However, whether or not the evidence is conclusive of Bucio's guilt is irrelevant to Bucio's motion to suppress.

8

officers' initial protective sweep of the trailer was unwarranted under the circumstances, and therefore their observation of the currency in Bucio's bedroom should be suppressed.

The court first will address the officers' protective sweep of the trailer. A "protective sweep" of premises incident to a lawful arrest is entirely proper under the circumstances presented here. The United States Supreme Court explained in *Maryland v. Buie*, 494 U.S. 325, 327-28, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990):

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. . . . We conclude that the Fourth Amendment would permit the protective sweep undertaken here if the searching officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing," *Michigan v. Long*, 463 U.S. 1032, 1049-1050, 103 S. Ct. 3469, 3480-3481, 77 L. Ed. 2d 1201 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968)), that the area swept harbored an individual posing a danger to the officer or others.

*Id.*, 494 U.S. at 327-28, 110 S. Ct. at 1094-95. Such a protective sweep "is nevertheless not a full search of the premises, but . . . lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.*, 494 U.S. at 335, 110 S. Ct. at 1099.

In the present case, at the time of the officers' protective sweep of the trailer, they had not established probable cause to arrest Lopez. However, as the officers testified at the hearing, they always are on alert during a drug investigation. Of particular concern in this case was the fact that the sheriff's deputy had seen another individual at the trailer a short time earlier in the evening, and there was more than one vehicle parked in front of the trailer. The court finds that under these circumstances, the officers were justified in making a protective sweep of the trailer, even without Lopez's consent.

9

The next question is whether Lopez had the authority to consent to the subsequent, warrantless search of the trailer, including Bucio's bedroom.

> It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement, *United States v. Karo,* 468 U.S. 705, 717, 104 S. Ct. 3296, 3304, 82 L. Ed. 2d 530 (1984), and that consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854 (1973). . . .

*United States v. Jaras*, 86 F.3d 383, 388 (5th Cir. 1996). The Government has the burden of establishing an exception to the Fourth Amendment's warrant requirement by a preponderance of the evidence. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000); *Jaras*, 86 F.3d at 389.

The analysis begins with the "obvious" standard recognized by the Supreme Court in *United States v. Karo*, 468 U.S. 705, 715, 104 S. Ct. 3296, 3303, 82 L. Ed. 2d 530 (1984):

> At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable. Our cases have not deviated from this basic Fourth Amendment principle. Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances. *Welsh v. Wisconsin*, 466 U.S. 740, 748-749, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984); *Steagald v. United States*, 451 U.S. 204, 211-212, 101 S. Ct. 1642, 1647-1648, 68 L. Ed. 2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980).

A significant difference exists, however, between a warrantless search, even one based on probable cause, and a search that is conducted with the consent of one who has "common authority over or other sufficient relationship to the premises or effects sought

to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 998, 993, 39 L. Ed. 2d 242 (1974). "'[W]here two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either.'" *Id.*, 415 U.S. at 169 n.4, 94 S. Ct. at 992 n.4 (quoting, with approval, *United States v. Sferas*, 210 F.2d 69, 74 (7th Cir.), *cert. denied sub nom. Skally v. United States*, 347 U.S. 935, 74 S. Ct. 630, 98 L. Ed. 1086 (1954)).

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

*Georgia v. Randolph*, ___ U.S. ___, 126 S. Ct. 1515, 1518, 164 L. Ed. 2d 208 (2006).

Thus, for Lopez's consent to search the trailer to be valid, the Government must demonstrate that Lopez shared, or reasonably was believed to share, authority over the areas searched. *Id.*; *see Basinski*, 226 F.3d at 834; *Jaras*, 86 F.3d at 389 (citing *Rodriguez*, 497 U.S. at 186-87, 110 S. Ct. at 2800-01; *Matlock*, 415 U.S. at 169-70, 94 S. Ct. at 992). If the Government fails to sustain this burden, the evidence must be suppressed. *Basinski*, 226 F.3d at 834.

To establish actual authority, the Government must show the following:

> A finding of actual authority requires proof that the consenting party and the party challenging the search "mutually used the property searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search." *United States v. Rizk,* 842 F.2d 111, 112-13 (5th Cir.) (*per curiam*), *cert. denied,* 488 U.S. 832, 109 S. Ct. 90, 102 L. Ed. 2d 66 (1988).

*Jaras*, 86 F. 3d at 389; *see United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) (citation omitted).

As an alternative to establishing that Lopez had actual authority to consent to a search of the trailer, the Government may show he had apparent authority to consent to the search. To establish apparent authority, the Government must show "a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched." *Basinski*, 226 F.3d at 834 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990); *United States v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir.1990)); *see also Welch, supra*.

"It is well established that an adult co-occupant of a residence may consent to a search[.] *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999) (citing *United States v. Reeves*, 730 F.2d 1189, 1193-94 (8th Cir. 1984)). The question here is whether Lopez either had actual authority, or the officers reasonably could have believed he had common authority, over the entire trailer, including Bucio's bedroom. *See Matlock*, 415 U.S. at 170, 94 S. Ct. at 992. As to the area outside of Bucio's bedroom, the court finds "'the facts available . . . justified a reasonable officer in the belief that the consenting party [Lopez] had authority over the premises,'" and could consent to a search of the entire premises by authorities. *United States v. Oates*, 173 F.3d 651, 657 (8th Cir. 1999) (quoting *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997)).

However, specifically with regard to Bucio's private bedroom, the court concludes nothing said or done by Lopez would have led a reasonable officer to believe Lopez had the authority to consent to a search. *See United States v. Heisman*, 503 F.2d 1284, 1288 (8th Cir. 1974) ("Although there was no door or lock to [the defendant's] room, it was nevertheless an area set aside for his own private use. . . . As a practical matter, [the cotenant] did not have access or control of [the defendant's] room for any purpose. [The

defendant and the cotenant] were co-tenants in a building in which there were both common areas of use and private areas for each to run his separate business. In short, [the cotenant] had a legal but not a possessory right to the area in which [the defendant] stored his work product. Thus, [the cotenant] could not legally consent to a search of that area."); *United States v. Abdenbi*, 361 F.3d 1282, 1297 (10th Cir. 2004) ("[A] simple co-tenant relationship does not create a presumption of control and actual access would have to be shown. *See United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) ('Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms without explicitly making this exception clear to one another.').").

However, Lopez's lack of authority to consent to a search of Bucio's bedroom does not require suppression of the currency located in Bucio's bedroom. The officers observed the currency in plain view in Bucio's bedroom during their protective sweep of the trailer. The court has found, above, that the protective sweep of the trailer was authorized. The officers therefore could seize the currency and other items in plain view as evidence without a warrant. *See United States v. Thomas*, 249 F.3d 725, 730 (8th Cir. 2001) (citing *United States v. Hughes*, 940 F.2d 1125, 1126-27 (8th Cir. 1991)); *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (citing *Maryland v. Buie*, 494 U.S. 325, 330, 110 S. Ct. 1093, 1096, 108 L. Ed. 2d 276 (1990); *United States v. Evans*, 966 F.2d 398, 400 (8th Cir. 1992)).

## *CONCLUSION*

Bucio has failed to show that any of the evidence against him should be suppressed, and it therefore is respectfully recommended that his motion to suppress be **denied**. Objections to this Report and Recommendation must be filed by **January 8, 2007**. Responses to objections must be filed by **January 11, 2007**.

IMPORTANT NOTE: Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **January 5, 2007**, **regardless of whether the party believes a transcript is necessary to argue the objection**. If an attorney files an objection to this Report and Recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 3rd day of January, 2007.

*[Signature]*

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT